The next case on the calendar for argument is United States v. Korchevsky and Kalupsky, 19-197 and 19-780. May it please the Court, my name is Randy Singer and I represent the appellant, Mr. Korchevsky. The essence of our appeal falls into two categories. First, that Mr. Korchevsky was indicted on one thing and tried on another. And those constructive amendments and variances go to the very core of the thing that the grand jury clause is designed to prevent, and that is that a defendant should know the specific charges against them and be prepared to defend them at trial. Secondly, in two occasions, the trial court became a partner in the fact-finding process with the jury. The first occurred when the court gave a conscious avoidance instruction that was not predicated on any evidence produced by either the prosecution or the defendant in the case. The second occurred deep in the deliberative process when the court flagged an iPad extraction report and a Stargate email. That email was hotly contested as to whether that iPad was in the possession of Mr. Korchevsky or the government's cooperating witnesses, Mr. Dubovoy, at the time that that email was sent. Despite that disputed evidence, when the jury asked for Korchevsky-Stargate-Dubovoy correspondence over the objection of the defendant, the court gave them Exhibit 423, which is the iPad extraction report, and flagged that part of the extraction report that represented a Stargate email, which the defense said was that iPad was in the possession of the government's witness when that email was sent. Not only that, but the court overruled the defendant's objection to sending it back. It didn't give any cautionary language, for example, saying the defense contested this email represents correspondence from Mr. Korchevsky, just sent it back, flagged it as the government requested. What did you ask for? On that issue, Your Honor, we're asking for a retrial, because that goes to the heart of all the cases. What did you ask the government to do? Did you take a — I'm sorry, the judge to do. Did you take objection? Did you ask for a curative instruction? Yes, Your Honor. We made an objection. We did not ask for a curative instruction. In fact, as we made the objection, the court said, I listened to the testimony, too. It goes back, which is a further indication that the court is making a factual determination based on its view of the testimony, and so we didn't really have an opportunity to ask for curative instruction at that point. Is this Exhibit in evidence? It is, Your Honor. It's Exhibit in evidence, the report. The exhibits didn't all go back with the jury, and so the jury would request exhibits, for example. But everything had been marked and offered and was accepted in evidence. That's correct, Your Honor, yes. But when the jury in the deliberative process asks a question to the court, as the courts have recognized, the judge's words carry a lot of weight. And even though this is reviewed under abuse of discretion, the judge has to be careful in exercising that discretion, because the jury puts a lot of stock in what the judge says. And when the jury asks, not just for—in the government's brief, they say that it was appropriate for the judge to respond to Stargate correspondence, but the request, the jury request, wasn't for Stargate correspondence. It was for Korchevsky-Stargate-Dubovoy correspondence. And on that regard, the court should have just instructed the jury, you've heard the evidence. If you want specific exhibits, we'll give those to you, but you must use your own recollection with regard to the evidence. Now, I'd like to move to my variance and constructive amendments arguments, if I can. There are really — the government has constructively amended the indictment in three ways. First, by saying their indictment alleges a single conspiracy, but the proof at trial was for multiple conspiracies. But— And how is that? The government's cooperating witness, Mr. Dubovoy, said that he kept knowledge of Mr. Kalubsky's trading from Mr. Korchesky's trading. And, Your Honor, it is our contention that if you look at the case law from the Second Circuit, in a spoken— They didn't know. Presumably, Korchesky and Kalubsky were not agreeing together. Yes. They were doing the individual trades separately. But if you look at this as Dubovoy's scheme with getting traders in there that he wants, why isn't this just one big scheme with different operatives at different points doing different things? Your Honor, I think if you look at this circuit's spoken wheel conspiracy, which is, I think, how you would characterize this, with Dubovoy at the center of the spokes— In other words, it wasn't just Dubovoy, right? There were other people involved. There was a family. Right. There were other middle— So the conspiracy existed certainly at that level. It's not just like a single person— That's correct. —reaching out with spokes. This is a hub with different people conspiring, bringing in other people to do some of the work. That's correct, Judge. And so if you look at those people as the center, the hub of this, I think under this circuit's case law, if the spokes aren't aware of the other spokes, then it's a multiple conspiracy. So, for example, the Johanson case, which at the hub was a car dealership that was using stolen credit cards. The folks that were using the stolen credit cards, the spokes, didn't know of each other. And this Court held that that's a multiple conspiracy. And we would say that the same is true with the McDermott case, which was discussed in our brief. So in addition to the single conspiracy issue, there's a constructive amendment and there's a variance on the stocks that the government says are the very essence of the illegal trades in this case. The superseding indictment listed 91 stocks. Two weeks before trial, the defense made a motion saying we're entitled to know what stocks you allege were illegally traded. And the government resisted that motion, but the Court told them to provide a list. When they provided the list, it had 226 stocks, which were substantially different than the 91 stocks. There was only an overlap of 26 stocks. That goes to the core of criminality in this case, and that's a constructive amendment, which requires reversal, even if we don't show substantial prejudice, which we would. Since they ended up relying largely on the pattern that was shown and the relationship between certain trades and access to information in the various wire services, why isn't that enough to show a scheme? I mean, how are you prejudiced really in defending against that by not having specific stocks, trades that were identified as illegal per se, since they were proceeding under a somewhat different theory? Yes, Your Honor. Well, the fact that they're proceeding under this theory of trial, which is it's all superseding indictment says, here's a list of 91 stocks which you illegally traded. In preparing for trial, the defense counsel is preparing to rebut those 91 stocks that were supposedly illegally traded. Then when they asked the government's expert witness, what about this stock trade, the government's expert says, I'm not saying any of them are illegally traded. I'm just saying it's suspicious of these now 850 trades in this. Well, isn't it more than suspicion, though? I mean, there are a lot of particular correlations to access to particular press releases over an extended period of time and very responsive trades tied to those press releases. I mean, that's how they're more circumstantially maybe than you would like to prove their case, but nonetheless, that was still the essence of it. So I'm not entirely sure how you would be prejudiced in responding to that by not knowing exactly which trades of the many, many hundreds, thousands were claimed to be illegal. Well, I think we're prejudiced because, you know, the issue of an indictment is that the defense shouldn't have to seem like we're nailing jello to a wall in order to figure out what the government's case is. And when the superseding indictment says here's it doesn't say there's a scheme. We're going to prove it by suspicious trades. It says here's 91 stocks were illegally traded. We're I'm sorry. Go ahead. We're preparing for those 91 stocks. And now we're met with an amorphous described scheme of 850 trades. What if the indictment had just provided a scheme and said stocks were traded? And then later on you say, well, that's not enough. We need to have a bill of particulars. And the bill of particulars comes in and they say 90 stocks. And then you say, well, were there any more? And they say, yes, there were. And they provide more stocks. Then you've got that bill of particulars. I don't understand how you're prejudiced. Judge, I think that's an absolutely critical distinction. I think under the Styrone case, the U.S. Supreme Court case, and this circuit's Milstein case, the holding in those two cases is if you have a general or a broad indictment and then you prove specific things which are encompassed within the broad indictment, that's not a constructive amendment. But when you have a specific indictment, in both those cases, the courts found there was a constructive amendment because it was a specific indictment, and then the government broadened the proof at trial. And the court held, we can't tell whether the defendants were convicted under facts in the indictment or facts outside the indictment, and therefore there's a constructive amendment. So that's how we would say we were prejudiced under these. Sotomayor, you have a conspiracy to engage in illegal gambling. And they, the government proves or offers in the indictment that certain people were engaged in this and there were certain, you know, wagers made, but then they come in and say, well, after notifying the defense that, indeed, there were other wagers made, why can't that be all part of the same scheme? I don't understand why this is any different. I mean, this case didn't revolve around the stocks themselves, the nature of the companies and so forth. This case involved around insider, not insider, but confidential information being supplied to the traders illegally. And, you know, that was the scheme, and there were plenty of trades that occurred pursuant to the scheme. The government said X in the indictment, and then they said plus in the subsequent to that. Well, Your Honor, both parties agree that the difference between a constructive amendment and a variance is a matter of degree. And, yes, the government said X in the indictment, but then they didn't just say plus X. They said, here's 91 stocks in the indictment. Here's 226 stocks over here, or 221 stocks, only 26 of which overlap. When we're preparing a case based on this set of facts, and then two weeks, actually seven days before trial, we get a whole new set of facts, a whole new set of stocks, how can we defend what that scheme or that general suspicious pattern, allegedly suspicious pattern, looks like when we haven't been adequately informed until a week before trial of what the stocks actually were? Thank you very much. Thank you, Your Honor. We have two minutes of rebuttal. We'll hear from Mr. Fields. Good morning, Your Honor. Good morning. May it please the Court, my name is Daryl Fields and I represent Mr. Kalubsky. I'd like to focus my argument on Venue. Your tie is over your shoulder. Yeah. We don't want to be distracted. I apologize. I'd like to focus my argument on Venue. Our argument is that Venue was not properly laid in the Eastern District of New York on the two substantive counts of securities fraud. Mr. Kalubsky made the trades, if he made them, he made the trades in Odessa, Ukraine through his brokerage firm. The trades were made on stock exchanges based in Manhattan and the companies from whom the hackers allegedly took this information from, obtained this non-public information from, their headquarters were in Manhattan, Toronto, and San Francisco. Now, when it comes to Venue, the critical element is where the acts constituting the offense took place. And those acts are called the essential conduct elements. That's true. Yes, Your Honor. The acts take place and it's where certain of the activities occurred without which there wouldn't have been the transaction. And as I understand it, the mechanics of the transaction involved were within the Venue. No, Your Honor. The core, the essential core elements of this offense, securities fraud, occurred when the trades were executed on the New York stock exchanges. That's not the test. I'm saying that the test is when the transaction goes through, does it go through the area in which the jurisdiction in which the case was brought? Not a question of intent. Not a question of worrying about what district is involved. Well, the part of the defendant. The defendant doesn't think about districts. The defendant is thinking about committing a crime. And the districts occur, the venture occurs wherever there's, if there's a nexus. It's where the act is. It's where the act is. That's what this Court says in Ramirez. This is what this Court always says. It's where the acts constituting the offense occur. His acts, the acts that constitutes the substantive securities fraud. I'm not talking about the three conspiracy counts, Judge Walker. The substantive securities fraud counts occurred when trades were executed on non-public information. The site of those trades, that site was Manhattan. That's where NASDAQ is, and that's where the New York Stock Exchange lies. That's where he, that's where the trades were executed. They weren't executed in the Eastern District of New York. The government's argument is. The trade confirmations, I don't know what happens electronically, but it used to be a time when you had paper. Yes, Your Honor. And trade confirmation is generated from within the district. Why isn't that sufficient? The government's, their argument is that because the back office, the back office clears it. Yeah. Yeah, but that's not where his acts occurred, and it's not reasonably foreseeable in the venue context that that would happen. It's like, in the Sobota case where this Court adopted the reasonable foreseeability test, it discusses this, the case Bez, Bez, Bez Malinovic. In Bez Malinovic, the person does a fraud in the Eastern District. He does a fraud, a bank fraud in the Eastern District. The check, the bank clears the check in Manhattan. All the banks clearing on the checks take place in Manhattan. Like here, the processing of the check. The processing of the trade may happen in some other location, but the defendant's conduct, the defendant's actions took place in Bez Malinovic in Brooklyn. And the processing took place in Manhattan, but venue was not properly laid in the Southern District because even though it's in a but-for sense, his fraud couldn't have happened unless he got the money cleared, which happened in Manhattan. His acts took place in Brooklyn. And all that happened in Manhattan was just a sort of, sort of just a clearing of the check was not sufficient to distill, because he didn't do any act in Manhattan. So is the issue here, as far as you're concerned, whether it was reasonably foreseeable or not, that the acts would take place and there would be aspects of the transaction that would take place in the Eastern District, and you're saying it wasn't foreseeable, reasonably foreseeable? Yes. It's like in sub suboda where this Court adopted reasonable foreseeability. The defendant was in Texas. He was on his computer. He went online to his Charles Schwab account and traded on inside information. And his argument was he shouldn't be prosecuted in the Southern District where the trades happened on the New York Stock Exchange and Amex because he made his trade on a computer in Texas. And this Court said, well, that was reasonably foreseeable. First, he made 13 trades. After the first trade, Charles Schwab sent him a confirmation stating that the trades were made on the exchange. And secondly, he was sophisticated, and given the nature of the stocks he was trading in, it was reasonable for him to foresee that the trades would be executed in the Southern District. But there the trades were executed in the Southern District of New York. No trades were executed here. No trades were executed in the Eastern District. They were all executed in the Southern District of New York. And there's just the government cites no, you know, no case that says that where the buyer of a security resides is the location of venue. The buyer's transaction occurred at a market. That market was in New York. So venue is not proper in the Eastern District any more than it would be proper in California, St. Thomas, or any other place in the country where somebody might be a counterparty on the trade. Thank you. Because the defendants' acts were in the Southern District of New York. Thank you. Thank you very much. You have two minutes of rebuttal. We'll hear from the government. Thank you. Good morning, I believe. May it please the Court, my name is Julia Nestor, and I represent the United States on appeal. I also represent the United States in the district court along with my colleagues at counsel's table. Could you begin, Ashley, by addressing venue, because it's an issue that recurs and applies to both defendants? Sure, Your Honors. Your Honor, the venue issue here, as to Mr. Holupski, who just spoke about it, seems to be he's focused on foreseeability. I think there are a number of factors that What exactly occurred in the Eastern District of New York where the prosecution took place? So there are a number of factors that led to venue in the Eastern District of New York. One were the counterparties on some of the trades were in the Eastern District of New York. There were also potential counterparties, one in two chance, of other transactions that also were in the Eastern District of New York. So you have a flavor of two different things. But there were actual counterparties on the other side of the transactions that happened in the Eastern District. And as to Mr. Holupski, we know which transactions we're talking about as opposed to a pattern? We know some of the transactions, and we also know that there's a pattern. So, for instance, there were transactions in the Dubuvois accounts. Both Mr. Korchetsky and Holupski traded in the Dubuvois accounts. There are transactions in those accounts that were the counterparty was in the Eastern District of New York. Okay, so we're not just relying on some ministerial computer act that happened on a server in New York. Is that right? That's correct. I think Your Honor is referring to the DTCC, which is another avenue for venue. And that we believe the government takes a position that wasn't ministerial. All of the transactions were processed through the DTCC. And we believe that that also constituted venue. And how would that have been foreseeable to Mr. Kolupski? Sure, Your Honors. I think this is a unique case in foreseeability for venue. There were thousands of illegal trades here. Those illegal trades were all done on the news. You're saying illegal. Illegal, yes, Your Honor. There were thousands of illegal trades here. They were done on the New York Stock Exchange and exchanges in New York. These were sophisticated defendants. Both defendants had a great deal of training and experience with trading. They understood how trading worked, and that was part of the record. And the vastness of the scheme here, Your Honors, we believe leads to venue not just based on the counterparties to the trades, but also the fact that all of the transactions are processed in Brooklyn through the DTCC. And I would say for Mr. Korchesky, there's one other point. He had a business called NTS Capital. That business cleared many of the illegal trades through Brooklyn, actually through J.P. Morgan in Brooklyn. And so that was another point of foreseeability. He actually got transaction records that indicated that the transactions were being cleared through Brooklyn. Are there documentary evidence that he would have had access to or seen that shows that there was activity in Brooklyn? That's correct, Your Honor. Okay. Thank you. I'd like to move on quickly to multiple conspiracies. And I'd like to address the — well, first, the government alleged and proved the existence of four different conspiracies. I want to make sure that's clear, because I don't think that the briefing papers really make that very evident. So there are four different conspiracies. The objective — so there's wire fraud, there's securities fraud conspiracy, computer intrusions conspiracy, and promotional money laundering. The goals of each of these conspiracies was obviously to steal press releases. In addition, for purposes of the securities fraud conspiracy, the goal was to trade on the press releases. And so the question here is, are Mr. Kalupsky and Mr. Korchesky part of the same conspiracy? I think the answer is undoubtedly yes. They're answering to the same people, the Dubois. There's case law in the Second Circuit that they do not have to know each other, nor is Mr. Dubois' one-off statement defense. Do they have to know that each other exists or that other people are participating in the conspiracy? I mean, because it could have been conducted just as a single relationship, couldn't it? Sure, Your Honors. Your Honor, they do need to know that other people exist, or they have to — it should be something that they could be aware of. But in this particular case, they are aware that this is a pretty vast conspiracy. Both Mr. Korchesky and Mr. Kalupsky are working with multiple people. They know there are hackers in the Ukraine doing this. They know that there are middlemen in the Ukraine doing this. They know that the Dubois are doing this. They see the vast amount of trading in this case. Mr. Korchesky, at the beginning of the scheme, acts as a server, and throughout the scheme acts as a server that houses press releases. It is clearly foreseeable to him that there are other people who are trading. A server is not just created for his benefit. So in this case, there's clear foreseeability. But that to me suggested that he would know that there are hackers, and he's obviously dealing with the Dubois and so on. But it wouldn't necessarily suggest that there are a lot of other people who are pursuing the same goal as he. Sure, Your Honor. And the purpose of the conspiracy here, and this was proven through the government's evidence, the purpose was for the entire conspiracy to make money. But clearly to pay the hackers to keep doing this because there's an incentive to do this. And the idea is that one trader alone isn't enough, right? And so this is foreseeable given the government's evidence to the defendant, especially I think the fact that there is this entire database set up for these press releases. It's not just the hackers doing this. This is set up for other people to use and to trade. You would say it's inherent in the scheme. Yes, Your Honor. And just briefly on constructive amendment. First, I would say that Mr. Boies. Back up just one second. You talked about four conspiracies. I thought there was a conspiracy to commit wire fraud and a charge. I'm talking about the actual charge. There are only three charges, Your Honor. Securities fraud, wire fraud, conspiracies, and two substantive counts of securities fraud, and then there's a money laundering conspiracy. Is that right? That's correct. There's a money laundering conspiracy, a wire fraud conspiracy, securities fraud, and computer intrusions conspiracy, which is in one count, Your Honor. I see. Okay. Does that answer the Court's question? For constructive amendment, it's the government's position, obviously. It's all rising out of the same course of conduct. That's exactly right, Your Honor. There is no constructive amendment or variance here because the evidence of the additional specific trades that Mr. Korchevsky objects to fell squarely in the charge scheme. As Your Honor pointed out, the charge scheme here did not need to allege one or two or three. It could have alleged a number of trades, which it did. And the government provided extensive notice pre-trial at Judge Steere's direction at times of specific trades that were approved. In fact, pre-trial briefing in this case gave away a very detailed summary of the government's evidence. We laid out exactly how we were going to prove the evidence. We indicated certain trades that we were going to highlight. The 221 trades that we provided a list of in advance of trial. The government's exhibit with respect to the venue also provided trades that the government approved. Were you able to prove that all of the trades that you provided to the defendant's counsel were, in effect, based upon this confidential information? We were not able to. Or did you just, did you prove some trades and then say there's a general, general pattern of doing this with, based on confidential information? And by the way, here are a lot more stocks. But we don't know, we don't have specific evidence with regard to each one. We provided certain additional evidence as to certain trades and relied on the expert and the scheme as a whole to prove that they were indeed trading in the majority illegally. So there wasn't proof as to every single trade. But as the Court articulated, there didn't need to be, because these were charges, conspiracies and schemes under the securities laws. If Your Honors don't have additional questions, we'll leave the rest in our papers. Very good. Thank you very much. Mr. Singer. Thank you, Your Honor. With regard to the single versus multiple conspiracies issue, I think that this is important to hear, because in McDermott, the Court said that the issue isn't what is the purpose of the conspiracy. The issue is what did the defendants allegedly agree to. In the McDermott case, they said McDermott didn't agree to be part of the conspiracy that involved Pompaneo. The government keeps talking about the purpose of the conspiracy. But the issue is, did Mr. Korchesky allegedly know about Mr. Kalupski? Did he agree to be part of the conspiracy? But he wouldn't necessarily need to know about Mr. Kalupski. He knew that he was accessing servers that hackers had operated to provide him access, early access to press releases that he could trade on. And the nature of that venture is a significant one. It necessarily involves multiple people. And it wasn't being done just for him. There was no basis for him to think it was being done just for him. So why is it unreasonable to think that he would have anticipated the involvement of other similar traders, such as Mr. Kalupski? Your Honor is right that he did not have to know of Mr. Kalupski by name. But this Court's case law represents the fact he has to know of Mr. Kalupski by class. In fact, the government's testimony is their cooperating witnesses said that we drew Mr. Korchesky into this conspiracy by telling him we needed a trader in order to carry out the conspiracy. If that's what they told him, why should he think that other traders were involved in the conspiracy? There's simply no evidence in the record to suggest that he knew other traders were involved in the conspiracy or that they shared resources between the traders. In a narcotics case, you have a group that buys narcotics and packages it and gets it all ready for retail and then wholesales it out to distributors who then sell it to other people who distribute the drugs to the customers. And there are multiple suppliers to this conspiracy. Do those suppliers all have to know who the other suppliers are? They don't have to know who the specific other suppliers are. They have to know that if it's a big conspiracy, isn't it sufficient if they are suppliers and there are other suppliers, that they don't know necessarily who or how much they're supplying? Your Honor, we would But it's likely that there are, it's highly probable that there are multiple, multiple contributors to this scheme. We would say the analogy in this would be Korchesky being the person who's selling the drugs if the Court's using the drug analogy. And so, therefore, we think it's like the Dove case that this Court decided where the government admitted there was a variance between the single conspiracy alleged in the indictment and the proof at trial because Mr. Dove didn't know that there were other traders involved. It wasn't prejudicial, though, in Dove, was it? That was not prejudicial, Your Honor, but we I sat on the panel in that case. Oh, okay. Well, Your Honor's well aware of the facts in Dove, then. So we think it's prejudicial here because Mr. Kalupski did have the Oracle press release in his electronic evidence, and the government mentioned that eight times in the closing argument and, in fact, once said that Mr. Korchesky had the Oracle press release when he didn't. So we think in this case, being tried with Mr. Kalupski is prejudicial, whereas in the Thank you very much. Thank you, Your Honor. Okay. And we'll hear from Mr. Fields. Two minutes rebuttal. Thank you, Your Honor. There was no evidence introduced at trial that Mr. Kalupski knew there were counterparties in Brooklyn, that he got any notice or confirmation. This isn't like the Svoboda case where the defendant there got written confirmation that his trades were executed on the New York Stock Exchange. Mr. Kalupski probably got that kind of confirmation, but that just shows that he would know that his trades happened in the Southern District of New York. The government didn't introduce any evidence that he was given information about counterparties' locations in the Eastern District. Nor, obviously, no one gets notice of where, of what back office clears anything, I don't believe, and their evidence didn't show that. The fact that he was a sophisticated investor and understood that there would be counterparties and that there were multiple trades, I think a thousand on the part of Mr. Kalupski, that they, some of those, it's highly likely that some of those counterparties would be in the Eastern District. In fact, you know, isn't that sufficient? I mean, how's the government doesn't have to, they don't have to have a confession from the guy that he knows that there are counterparties in the Eastern District? No, but they have to prove he did acts in the district. And if acts occur in a district, he has to prove, they have to prove, that he was, that they were foreseeable. But the acts have to constitute the crime. He trades, if he trades on an exchange and there are counterparties to that trade, which there are, necessarily. Yes. And those that counterparties are in the area venue, why isn't that sufficient? It's not sufficient because his acts, the site of what he does is the Southern District of New York, not North Dakota. An individual through an account, through an exchange. If you use an exchange in New York, you're going to have counterparties all over the world. There's a policy of counterparties in Hawaii, California, St. Thomas, St. Croix, any place in the world, there'll be counterparties. He didn't get notice of that. There's a venue everywhere. Excuse me, Your Honor? There's a venue everywhere. Yeah, no, there would not be because it's acts. Because when venue leads to your acts, it's the essential conduct element. The essential conduct of a securities fraud was when he executed the trade. And I just want to point out that, as Ramirez said, provisions implicating venue are to be construed narrowly, and that the law favors a restrictive construction of venue. This venue would be far too excessive if you could have venue in any place just because, I guess, in the Eastern District there are a lot of human beings there. So any well-populated place in Texas, California, or even concentrated places in Missouri, they would have venue. That's just too broad. All right. Thank you very much. I think we have the arguments well argued. That concludes our oral arguments this morning. The clerk will please adjourn court. Thank you, Your Honor.